**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

GENESIS LABORATORY MANAGEMENT LLC,

Plaintiff/~~Counterclaim-Defendant~~Counterclaim Defendant,

v.

UNITED HEALTHCARE SERVICES, INC. AND OXFORD HEALTH INSURANCE, INC.,

Defendants/~~Counterclaim-Plaintiffs~~ Counterclaim Plaintiffs.

UNITED HEALTHCARE SERVICES, INC. AND OXFORD HEALTH INSURANCE, INC.,

Counterclaim Plaintiffs,

v.

GENESIS LABORATORY MANAGEMENT LLC,

Counterclaim Defendant,

AND

METROPOLITAN HEALTHCARE BILLING, LLC,

~~Third-Party Counterclaim~~Third Party Defendant.

Case No. 2:21-cv-12057-EP-JSA

**JURY TRIAL DEMANDED**

**UNITED HEALTHCARE SERVICES, INC. AND OXFORD HEALTH INSURANCE, INC.'S[1] ANSWER TO SECOND AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT**

**DEFENDANTS/COUNTERCLAIM PLAINTIFFS'**
**FIRST AMENDED COUNTERCLAIM AND THIRD PARTY COMPLAINT**

Defendants/Counterclaim Plaintiffs United HealthCare Services, Inc. ("United") and Oxford Health Insurance, Inc. ("Oxford") (collectively, "United and Oxford"), by and through their counsel Alston & Bird LLP, in accordance with Federal Rule of Civil Procedure 8(b), combine their Answers to Plaintiff/Counterclaim-Defendant Genesis Laboratory Management LLC's ("Plaintiff") Second Amended Complaint into this single document, stating as follows:

**THE PARTIES[2]**

1. United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1, and on that basis deny them.

2. Inasmuch as the allegations in Paragraph 2 relate to United, United admits that it is incorporated in Minnesota and headquartered in Minnetonka, Minnesota. United also admits that it operates in the State of New Jersey and issues health insurance and administers plans that are funded by plan sponsors in New Jersey. United denies the remainder of the allegations in Paragraph 2 as stated. The allegations in Paragraph 2 are not directed to Oxford, so no response

[1] Genesis Laboratory Management LLC filed this lawsuit against "Oxford Health Plans, Inc." However, that is a misnomer: The proper name is Oxford Health Insurance, Inc. not Oxford Health Plans, Inc. and Oxford Health Insurance, Inc. answers the Second Amended Complaint as reflected herein on Oxford Health Insurance, Inc.'s behalf. No answer is required from "Oxford Health Plans, Inc.," but inasmuch as an answer is required, Oxford Health Plans, Inc. denies each and every allegation in the Second Amended Complaint and denies that Genesis Laboratory Management LLC is entitled to any relief.

[2] The headings and sub-headings throughout the Second Amended Complaint do not constitute well-pleaded allegations and therefore require no response. To the extent that a response is required, the allegations in the headings and sub-headings throughout the Second Amended Complaint are denied. The Second Amended Complaint also contains footnotes, which are not reproduced herein and do not comply with Federal Rule of Civil Procedure 10(b), which requires that allegations be stated "in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Accordingly, no response is required to any footnote. To the extent that a response is required, United and Oxford deny the allegations in the footnotes throughout the Second Amended Complaint.

is required from it. Inasmuch as a response is required from Oxford, Oxford lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2, and on that basis denies them.

3. Oxford denies the allegations in Paragraph 3. The allegations in Paragraph 3 are not directed to United, so no response is required from it. Inasmuch as a response is required from United, United lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3, and on that basis denies them.

4. United and Oxford admit only that they issue and administer certain health insurance contracts and health benefit plans, certain of which are governed by the Employee Retirement Income Security Act of 1974 ("ERISA") or by state law. United and Oxford otherwise deny the allegations in Paragraph 4 as stated.

## JURISDICTION AND VENUE

5. Paragraph 5 cites 28 U.S.C. § 1331, 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 28 U.S.C. 1332. Those statutes speak for themselves, so no response is required. And the Court has an obligation to assure itself of its own jurisdiction. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). To the extent a response is required, United and Oxford deny the allegations in Paragraph 5.

6. Paragraph 6 cites 28 U.S.C. § 1367. That statute speaks for itself, so no response is required. And the Court has an obligation to assure itself of its own jurisdiction. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). To the extent a response is required, United and Oxford deny the allegations in Paragraph 6.

7. Paragraph 7 asserts legal conclusions, so no response is required. To the extent a response is required, United and Oxford do not challenge the Court's exercise of personal jurisdiction over them in this action at this time.

8. Paragraph 8 cites 28 U.S.C. § 1391. That statute speaks for itself, so no response is required. Otherwise, Paragraph 8 states a legal conclusion, to which no response is required. To the extent a response is required, United and Oxford admit that venue is proper in this District.

## FACTUAL ALLEGATIONS

9. To the extent that Paragraph 9 purports to quote or summarize materials from UnitedHealth Group's website or the New York Times, those materials speak for themselves, and to the extent that the allegations in Paragraph 9 are inconsistent with those materials, they are denied. United and Oxford deny all other allegations in Paragraph 9.

10. Paragraph 10 cites the Families First Coronavirus Response Act § 6001(a). That statute speaks for itself, so no response is required. Paragraph 10 also states legal conclusions to which no response is required. To the extent Paragraph 10 contains any factual allegations, they are denied.

11. United and Oxford deny the allegations in Paragraph 11.

12. United and Oxford deny the allegations in Paragraph 12.

13. United and Oxford deny the allegations in Paragraph 13.

### Relationship Between the Parties

14. United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14, and on that basis deny them.

15. United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15, and on that basis deny them.

~~16. United and Oxford admit only that they issue and administer certain health insurance contracts and health benefit plans, including Medicare Advantage plans. United and Oxford otherwise deny the allegations in Paragraph 16 as stated.~~

~~17. United and Oxford admit only that Genesis is an out-of-network provider. United and Oxford otherwise deny the allegations in Paragraph 17 as stated.~~

**~~Genesis's Role in Fighting the COVID-19 Pandemic~~**

~~18. United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, and on that basis deny them.~~

~~19. United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19, and on that basis deny them.~~

~~20. United and Oxford deny the allegations in Paragraph 20.~~

**~~Federal Rules Require United to Pay Genesis for Out-of-Network COVID-19 Testing~~**

~~21. United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 21, and on that basis deny them. Otherwise, Paragraph 21 states legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 21.~~

~~22. Paragraph 22 references ERISA, the FFCRA, and the CARES Act. Those statutes speak for themselves, so no response is required. Otherwise, Paragraph 22 states legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 22.~~

~~23. Inasmuch as Paragraph 23 purports to summarize the Frequently Asked Questions ("FAQs") issued by the Department of Health and Human Services ("HHS"), those materials speak for themselves, and to the extent that the allegations in Paragraph 23 are inconsistent with~~

those materials, they are denied. Otherwise, Paragraph 23 states legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 23.

24. Inasmuch as Paragraph 24 purports to quote the FAQs issued by HHS, those materials speak for themselves, and to the extent that the allegations in Paragraph 24 are inconsistent with those materials, they are denied. The remaining allegations in Paragraph 24 state legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 24.

25. Inasmuch as Paragraph 25 purports to quote the FAQs issued by HHS, those materials speak for themselves, and to the extent that the allegations in Paragraph 25 are inconsistent with those materials, they are denied. United and Oxford deny any remaining allegations in Paragraph 25.

26. Paragraph 26 purports to reference or quote the CARES Act and the FFCRA. Those statutes speak for themselves, so no response is required. Paragraph 26 also asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 26.

27. Paragraph 27 purports to quote the CARES Act. That statute speaks for itself, so no response is required. United and Oxford deny the remaining allegations in Paragraph 27.

28. United and Oxford deny the allegations in Paragraph 28.

29. United and Oxford deny the allegations in Paragraph 29.

30. Inasmuch as Paragraph 30 purports to quote the FAQs issued by HHS, those materials speak for themselves, and to the extent that the allegations in Paragraph 30 are inconsistent with

~~those materials, they are denied. United and Oxford deny any remaining allegations in Paragraph 30 as stated.~~

~~31. Paragraph 31 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 31.~~

~~32. Inasmuch as Paragraph 32 purports to summarize the FAQs issued by HHS, those materials speak for themselves, and to the extent that the allegations in Paragraph 32 are inconsistent with those materials, they are denied. United and Oxford deny any remaining allegations in Paragraph 32 as stated.~~

~~33. Inasmuch as Paragraph 33 purports to quote the FAQs issued by HHS, those materials speak for themselves, and to the extent that the allegations in Paragraph 33 are inconsistent with those materials, they are denied. United and Oxford deny any remaining allegations in Paragraph 33 as stated.~~

~~34. United and Oxford deny the allegations in Paragraph 34.~~

**~~United Inappropriately Withheld Payment for COVID-19 Testing Services in Bad Faith~~**

~~35. United and Oxford deny the allegations in Paragraph 35.~~

~~36. United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 36, and on that basis deny them. Inasmuch as the allegations in Paragraph 36 relate to United, United admits only that it paid certain claims for COVID-19 diagnostic testing in March, April, and May 2020. United denies the remaining allegations in Paragraph 36. Inasmuch as the allegations in Paragraph 36 relate to Oxford, Oxford denies them.~~

37. United admits only that, due to suspected fraud, waste, and/or abuse on Genesis's part, United requested clinical records documenting the services that Genesis purportedly provided. United and Oxford otherwise deny the allegations in Paragraph 37 as stated.

38. United and Oxford deny the allegations in Paragraph 38 as stated.

39. United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39, and on that basis deny them.

40. Inasmuch as Paragraph 40 purports to quote or summarize the FFCRA, the CARES Act, or the FAQs issued by HHS, those materials speak for themselves, and to the extent that the allegations in Paragraph 40 are inconsistent with those materials, they are denied. Otherwise, Paragraph 40 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 40.

41. United and Oxford deny the allegations in Paragraph 41.

42. United and Oxford admit only that Genesis billed claims using an incorrect Place of Service (POS) code. United and Oxford deny the remaining allegations in Paragraph 42.

43. Paragraph 43 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 43.

44. Paragraph 44 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 44.

45. United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 45, and on that basis deny them. As to the second sentence of Paragraph 45, the letter attached as Exhibit A to the Second Amended Complaint speaks for itself and does not require a response. To the extent a response is required, United and Oxford deny the allegations in the second sentence of Paragraph 45.

46. The letter attached as Exhibit B to the Second Amended Complaint speaks for itself and does not require a response. To the extent a response is required, United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46, and on that basis deny them.

## ERISA PLANS

47. Paragraph 47 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 47 as stated.

48. United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 48, and on that basis deny them. United and Oxford deny the remaining allegations in Paragraph 48.

49. Inasmuch as Paragraph 49 purports to identify certain ERISA plans governing certain of the claims at issue in the litigation, those materials speak for themselves and do not require a response. To the extent a response is required, United and Oxford deny the allegations in Paragraph 49.

50. Paragraph 50 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 50.

51. Paragraph 51 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 51.

52. Paragraph 52 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 52.

53. United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53, and on that basis denies them.

54. Inasmuch as Paragraph 54 purports to reference or identify certain ERISA plans at issue in the litigation, those materials speak for themselves and do not require a response. To the extent a response is required, United and Oxford deny the allegations in Paragraph 54.

55. Paragraph 55 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 55.

**ASSIGNMENT**

56. Inasmuch as Paragraph 56 purports to reference or cite certain assignment forms, those materials speak for themselves and do not require a response. Otherwise, United and Oxford deny the allegations in Paragraph 56.

57. Inasmuch as Paragraph 57 purports to quote certain assignment forms, those materials speak for themselves and do not require a response. To the extent a response is required, United and Oxford deny the allegations in Paragraph 57 as stated.

58. Inasmuch as Paragraph 58 purports to quote certain assignment forms, those materials speak for themselves and do not require a response. To the extent a response is required, United and Oxford deny the allegations in Paragraph 58 as stated.

59. Paragraph 59 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 59.

60. Inasmuch as Paragraph 60 purports to reference or summarize certain summary plan descriptions ("SPDs"), those materials speak for themselves. Otherwise, Paragraph 60 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 60, specifically as they attempt to mischaracterize the SPDs.

**COUNT I**
**Failure to Provide Benefits under ERISA Plans**
**(As to ERISA Plan Claims)**

61. Paragraph 61 incorporates Paragraphs 1 through 60 of the Second Amended Complaint. United and Oxford likewise incorporate their responses to Paragraphs 1 through 60 as if set forth in full.

62. ERISA speaks for itself and does not require a response. To the extent a response is required, United and Oxford deny the allegations in Paragraph 62.

63. ERISA speaks for itself and does not require a response. To the extent a response is required, United and Oxford deny the allegations in Paragraph 63.

64. Paragraph 64 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 64.

65. Paragraph 65 asserts legal conclusions to which no response is required. To the extent a response is required, and inasmuch as the allegations in Paragraph 65 relate to United, United admits only that it sent a letter to Genesis's counsel requesting that Genesis discontinue submitting appeals related to claims subject to this litigation, which speaks for itself. United denies the remaining allegations in Paragraph 65. Inasmuch as the allegations in Paragraph 65 relate to Oxford, Oxford denies them.

66. Paragraph 66 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 66.

67. Paragraph 67 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 67.

68. Paragraph 68 asserts legal conclusions to which no response is required. To the extent a response is required, United and Oxford deny the allegations in Paragraph 68.

~~69. Genesis's demand for relief is not an allegation, so no response is required. If a response is required, United and Oxford deny that Genesis is entitled to relief.~~

**~~COUNT II~~**
**~~Breach of Implied Contract~~**
**~~(As to Non-ERISA Plan Claims)~~**

~~70. Paragraph 70 incorporates Paragraphs 1 through 69 of the Second Amended Complaint. United and Oxford likewise incorporate their responses to Paragraphs 1 through 69 as if set forth in full.~~

* * *

~~Paragraphs 71 through 84 relate to Genesis's breach of implied contract claim. This Court dismissed that claim with prejudice in its January 29, 2025 Order (ECF No. 120). Accordingly, no response to Paragraphs 71 through 84 is required. Inasmuch as a response is required, United and Oxford deny the allegations in Paragraphs 71 through 84.~~

**~~COUNT III~~**
**~~Breach of the Covenant of Good Faith & Fair Dealing~~**
**~~(As to Non-ERISA Plan Claims)~~**

~~85. Paragraph 85 incorporates Paragraphs 1 through 84 of the Second Amended Complaint. United and Oxford likewise incorporate their responses to Paragraphs 1 through 84 as if set forth in full.~~

* * *

~~Paragraphs 86 through 91 relate to Genesis's breach of the covenant of good faith and fair dealing claim. This Court dismissed that claim with prejudice in its January 29, 2025 Order (ECF No. 120). Accordingly, no response to Paragraphs 86 through 91 is required. Inasmuch as a response is required, United and Oxford deny the allegations in Paragraphs 86 through 91.~~

**COUNT IV**
**Unjust Enrichment & Quantum Meruit**
**(As to Non-ERISA Plan Claims)**

92. Paragraph 92 incorporates Paragraphs 1 through 91 of the Second Amended Complaint. United and Oxford likewise incorporate their responses to Paragraphs 1 through 91 as if set forth in full.

* * *

Paragraphs 93 through 99 relate to Genesis's unjust enrichment and quantum meruit claim. This Court dismissed that claim with prejudice in its January 29, 2025 Order (ECF No. 120). Accordingly, no response to Paragraphs 93 through 99 is required. Inasmuch as a response is required, United and Oxford deny the allegations in Paragraphs 93 through 99.

**COUNT V**
**Promissory Estoppel**
**(As to Non-ERISA Plan Claims)**

100. Paragraph 100 incorporates Paragraphs 1 through 99 of the Second Amended Complaint. United and Oxford likewise incorporate their responses to Paragraphs 1 through 99 as if set forth in full.

* * *

Paragraphs 101 through 108 relate to Genesis's promissory estoppel claim. This Court dismissed that claim with prejudice in its January 29, 2025 Order (ECF No. 120). Accordingly, no response to Paragraphs 101 through 108 is required. Inasmuch as a response is required, United and Oxford deny the allegations in Paragraphs 101 through 108.

**COUNT VI**
**Violations of New Jersey HINT & HCAPPA**
**(As to Non-ERISA Plan and Fully Insured ERISA Plan Claims)**

109. Paragraph 109 incorporates Paragraphs 1 through 108 of the Second Amended Complaint. United and Oxford likewise incorporate their responses to Paragraphs 1 through 108 as if set forth in full.

* * *

Paragraphs 110 through 116 relate to Genesis's claim for violations of the New Jersey Healthcare Information Networks and Technologies Act ("HINT") and Health Claims Authorization, Processing, and Payment Act ("HCAPPA"). This Court dismissed that claim with prejudice in its January 29, 2025 Order (ECF No. 120). Accordingly, no response to Paragraphs 110 through 116 is required. Inasmuch as a response is required, United and Oxford deny the allegations in Paragraphs 110 through 116.

**COUNT VII**
**AWARD OF ATTORNEYS' FEES UNDER ERISA**
**(as to ERISA Plan Claims)**

117. Paragraph 117 incorporates Paragraphs 1 through 116 of the Second Amended Complaint. United and Oxford likewise incorporate their responses to Paragraphs 1 through 116 as if set forth in full.

118. Genesis's request for an award of attorneys' fees and costs is not an allegation, so no response is required. If a response is required, United and Oxford deny that Genesis is entitled to attorneys' fees and costs or any other relief.

119. Genesis's request for an award of attorneys' fees and costs is not an allegation, so no response is required. If a response is required, United and Oxford deny that Genesis is entitled to attorneys' fees and costs or any other relief. United and Oxford deny the remaining allegations in Paragraph 119.

~~The section of the Second Amended Complaint beginning "**WHEREFORE**" located on page 34 of the Second Amended Complaint merely contains statements of the nature of relief Genesis seeks, which do not require a response. Inasmuch as a response is required, United and Oxford deny that Genesis has any basis for or entitlement to any of the relief requested.~~

**~~JURY DEMAND~~**

~~No response is required. To the extent that a response is required, United and Oxford deny that Genesis has any basis for or entitlement to any of the relief requested.~~

**~~DESIGNATION OF TRIAL COUNSEL~~**

~~No response is required. To the extent that a response is required, United and Oxford lack knowledge or information sufficient to form a belief as to the truth of the statement in this section.~~

~~Any other allegations of the Second Amended Complaint that are not specifically admitted herein are denied.~~

**~~AFFIRMATIVE AND OTHER DEFENSES~~**

~~For its defenses, United and Oxford allege, without assuming any burden of proof that would otherwise rest on Plaintiff, as follows:~~

**~~First Defense~~**

~~Plaintiff lacks standing to assert claims for benefits belonging to participants and/or beneficiaries of health plans for which United and/or Oxford administer benefits.~~

**~~Second Defense~~**

~~Plaintiff's claims, in whole or in part, fail to state a claim upon which relief can be granted.~~

**Third Defense**

Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, laches, unclean hands, illegality, and *in pari delicto*.

**Fourth Defense**

The Court lacks subject matter jurisdiction over Plaintiff's claims inasmuch as they relate to Medicare and Medicaid claims, as Plaintiff failed to exhaust the administrative appeal process required prior to filing suit in federal district court.

**Fifth Defense**

Plaintiff has failed to exhaust administrative remedies regarding its claims.

**Sixth Defense**

Plaintiff seeks payment for services that were not medically necessary and/or not covered under the terms of the relevant plans.

**Seventh Defense**

Plaintiff's claims are barred, in whole or in part, because the relief sought, if granted, would unjustly enrich Plaintiff.

**Eighth Defense**

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitation.

**Ninth Defense**

Plaintiff's claims are barred for failure to comply with the terms and conditions of the relevant plans.

**Tenth Defense**

Plaintiff's claims are barred, in whole or in part, on the grounds that United and/or Oxford have discharged their obligations to Plaintiff and/or under the relevant plans.

**Eleventh Defense**

United and Oxford complied with all applicable laws and regulations in handling the claims at issue.

**Twelfth Defense**

To the extent the relevant plan documents afford United and/or Oxford the discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the plan, the Court should apply an arbitrary and capricious standard of review in reviewing claim decisions. United and Oxford's decisions and actions with respect to the claims at issue were neither arbitrary nor capricious but were correct, legitimate, and reasonable.

**Thirteenth Defense**

Plaintiff's claims are limited in this action to a review by this Court, without any jury, of the Administrative Record pertaining to the claim, including applicable Plan documents, so as to determine whether United and Oxford's determinations were arbitrary and capricious, and/or an abuse of discretion, and/or incorrect.

**Fourteenth Defense**

United and Oxford's interpretation of the relevant Plan documents was reasonable and its claim determinations were supported by substantial evidence.

**Fifteenth Defense**

United and Oxford's decisions and actions with respect to the claims at issue were based on the information before them at the time. To the extent Plaintiff's Second Amended Complaint impermissibly attempts to inject facts, issues, and materials into this case that were not part of the Administrative Record before United and/or Oxford, such facts, issues, and materials are not admissible in this proceeding and must be stricken.

**Sixteenth Defense**

While United and Oxford deny that Plaintiff is eligible for any additional benefits under any plans, should Plaintiff recover any benefits, such benefits are subject to all of the applicable terms, conditions, exclusions, overpayment recovery, and offset provisions provided for in the relevant plan documents.

**Seventeenth Defense**

Plaintiff has no claim for payment of attorneys' fees under ERISA because United and Oxford's handling of the claims was reasonable and all actions were taken in good faith.

**Eighteenth Defense**

To the extent Plaintiff seeks remedies not provided for under ERISA, those claims and remedies are preempted by ERISA.

**Nineteenth Defense**

While United and Oxford deny that Plaintiff is eligible for any benefits, should Plaintiff recover any benefits, such benefits are subject to all applicable laws and regulations.

**Twentieth Defense**

All communications United and Oxford had with its members or anyone else regarding claims for services submitted by Plaintiff were required or authorized by ERISA and/or applicable regulations.

**Twenty-First Defense**

All communications United and Oxford had with its members or anyone else regarding claims for services submitted by Plaintiff were true and accurate.

**Twenty-Second Defense**

Plaintiff's claims are barred, in whole or in part, because of Plaintiff's failure to mitigate its damages.

**Twenty-Third Defense**

Any damages Plaintiff suffered are a result of its own intentional, reckless and/or negligent conduct.

**Twenty-Fourth Defense**

Additional facts that may support additional defenses may come to light through discovery or further investigation. United and Oxford reserve the right to rely upon such other and further affirmative defenses as may be supported by the facts as the case progresses.

**UNITED HEALTHCARE SERVICES, INC. AND OXFORD HEALTH INSURANCE, INC.'S COUNTERCLAIMS AND THIRD-PARTY COMPLAINT**

Defendants/Counterclaim-PlaintiffsCounterclaim Plaintiffs United HealthCare Services, Inc. and Oxford Health Insurance, Inc. (together, "United"), for their amended counterclaims against Plaintiff/Counterclaim Defendant Genesis Laboratory Management LLC ("Genesis") and Third-Party Counterclaimtheir amended third party claim against Third Party Defendant Metropolitan Healthcare Billing, LLC ("Metropolitan") (together, "Counterclaim Defendants") in this action, allege as follows[1]:

## NATURE OF ACTION

1. From the outset of the COVID-19 pandemic and ensuing public health emergency, United strived to ensure that members of its health plans had access to COVID-19

[1] Genesis Laboratory Management LLC filed this lawsuit against "Oxford Health Plans, Inc." However, that is a misnomer: The proper name is Oxford Health Insurance, Inc.—not Oxford Health Plans, Inc.—and Oxford Health Insurance, Inc. answers the Second Amended Complaint as reflected herein on Oxford Health Insurance, Inc.'s behalf.

diagnostic testing and treatment. Like other businesses, governments, and many others, United was forced to adapt quickly to ever-changing circumstances, including rapidly changing and evolving legal and regulatory schemes implemented to address the pandemic.

2. Unfortunately, scores of unscrupulous actors, like Genesis and Metropolitan, took advantage of the uncertain times and rapid governmental response to enrich themselves at others' expense, including companies, like United, whom they viewed as having big pockets.

3. Genesis falls into that group of providers the federal government has identified as "using the [COVID-19] public health emergency as an opportunity to impose extraordinarily high charges."[~~3~~2] Indeed, Genesis's charges to United—which were routinely inflated through improper billing codes, unnecessary ancillary tests, and price gouging commercial payors such as United—were so "extraordinarily high" as to ultimately defraud United.

4. Genesis's fraudulent billing practices—effectuated in concert with its billing company, Metropolitan—caused United to overpay Genesis for basic testing services by at least **$30 million** over the course of the COVID-19 pandemic through July 2024.

[~~3~~2] FAQs About [FFCRA] and [CARES] Act Implementation Part 44 (Feb. 26, 2021), Q. 6 (available at https://www.cms.gov/files/document/faqs-part-44.pdf).

**THE PARTIES, JURISDICTION, AND VENUE**

5. Counterclaim Plaintiff United HealthCare Services, Inc. is a corporation organized under the laws of the state of Minnesota, with its principal place of business at 9700 Healthcare Lane, Minnetonka, Minnesota 55343.

6. Counterclaim Plaintiff Oxford Health Insurance, Inc. is a corporation organized under the laws of the state of New York that is licensed to do business in Connecticut, New Jersey, New York, and Pennsylvania.

7. Upon information and belief, Counterclaim Defendant Genesis is a limited liability company organized and existing under the laws of the State of New Jersey, with its principal place of business at 1912 Highway 35, Oakhurst, New Jersey 07755.

8. Upon information and belief, ~~Third-Party Counterclaim~~Third Party Defendant Metropolitan is a limited liability company organized and existing under the laws of the State of New Jersey, with its principal place of business at 151 Industrial Way E, Eatontown, New Jersey 07724.

9. Upon information and belief, additional, but presently unknown, individuals who own or are otherwise affiliated with Counterclaim Defendant Genesis and/or Third Party Defendant Metropolitan knowingly engaged in the fraudulent conduct described herein. The true names, affiliations, or capacities of the Doe Defendants are not presently known. Counterclaim Plaintiffs will further amend this Counterclaim to allege the true names and capacities of the Doe Defendants when evidence reveals their identities.

10. ~~9. Third-Party Counterclaim~~Third Party Defendant Metropolitan is added to this proceeding as a ~~counterclaim~~third party defendant in accordance with Federal Rules of Civil Procedure 13 and 20.

11. Third Party Doe Defendants are added to this proceeding as third party defendants in accordance with Federal Rules of Civil Procedure 13 and 20.

12. ~~10.~~ This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 because this action arises under the laws of the United States. This Court also has subject matter jurisdiction in accordance with 29 U.S.C. § 1132(e)(1) because the matter in controversy involves the enforcement of rights under ERISA.

13. ~~11.~~ This Court has supplemental jurisdiction over United's state law claims in accordance with 28 U.S.C. § 1367 because all claims alleged in these Counterclaims form part of the same case or controversy under Article III of the United States Constitution.

14. ~~12.~~ This Court has personal jurisdiction over Genesis because, upon information and belief, it is domiciled in New Jersey.

15. ~~13.~~ This Court has personal jurisdiction over Metropolitan because, upon information and belief, it is domiciled in New Jersey.

16. ~~14.~~ Venue is proper in this District in accordance with 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this judicial district and because Counterclaim Defendants conduct a substantial amount of business in this judicial district.

## FACTUAL ALLEGATIONS

17. ~~15.~~ Genesis is a New Jersey-based molecular diagnostic and anatomic pathology laboratory that offered various testing services during the COVID-19 pandemic, including

COVID-19 diagnostic testing and antibody testing. *See* Second Am. Compl. ¶¶ 14, 18. Genesis also offered other testing services not related to the virus causing COVID-19.

18. ~~16.~~ Upon information and belief, and according to its website, Metropolitan "is a New Jersey based Revenue Cycle Management company founded in 2010" "that offers personalized billing services to healthcare professionals nationwide[,]" including Genesis.[~~4~~3] Metropolitan also represents on its website to its clients and potential clients that it is ***"well-equipped to maximize out-of-network revenue."***[~~5~~4]

19. ~~17.~~ Upon information and belief, Genesis and Metropolitan are both owned by Rajiv Uppal, M.D. By virtue of their common ownership and coordinated operations, Genesis and Metropolitan functioned as a single, integrated billing operation designed to inflate claims and maximize reimbursements from out-of-network insurers, including United.

20. ~~18.~~ Genesis does not have a contract with United and is therefore "out of network."

21. ~~19.~~ Counterclaim Defendants "impose[d] extraordinarily high charges"[~~6~~5] on United in multiple ways.

---

[~~4~~3] https://metrohealthbill.net/about/.

[~~5~~4] *Id.*

[~~6~~5] FAQs About [FFCRA] and [CARES] Act Implementation Part 44 (Feb. 26, 2021), Q. 6 (available at https://www.cms.gov/files/document/faqs-part-44.pdf).

22. ~~20.~~ The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, required Genesis to post its cash price for a COVID test on its website. Genesis violated that emergency legislation passed during the global health emergency caused by the COVID-19 pandemic to ensure transparency around pricing for COVID testing services by falsely stating its "cash price" on its website, and charging United a rate more than five times the price it charged cash-paying customers.

23. ~~21.~~ Genesis apparently interpreted the CARES Act to allow it to write itself a blank check from commercial insurance companies and price gouge for diagnostic testing. Genesis represented on its website and to United that its posted cash price per COVID test was $256.50 until April 2020, when it doubled that price to $513.00. But in reality, Genesis's $513.00 "posted cash price" was a fiction: Genesis charged cash-paying customers $100.00 for the exact same COVID test (meaning that its cash price was actually $100.00, not $513.00). As addressed below, United pleads this "posted cash price" theory as the basis for equitable relief under ERISA (Count One) and related declaratory relief (Count Ten), and not as a basis for any claims that the Court dismissed with prejudice in its March 13, 2026 order.

24. ~~22.~~ Genesis also improperly billed for its testing services by, for example, frequently using the wrong Place of Service (POS) code~~, as well as~~; billing United for the exact same claim that another provider submitted~~. That~~; representing that ancillary tests were ordered, medically necessary, and performed when they were not; representing that high-throughput testing technology was used when it was not; and representing that its claims complied with applicable billing guidelines, when they did not. Those improper practices ultimately caused United to pay more than it should have, including in some instances paying twice for the same service: once to the facility where the specimen was actually taken, such as an urgent care, and

again to Genesis, which billed for the exact same claim. Upon information and belief, Metropolitan served as Genesis's billing company, with Genesis relying upon Metropolitan's services and working in concert with Metropolitan in submitting these improperly billed claims to United.

25. United's allegations concerning (i) duplicative billing, (ii) unbundling and billing for tests not ordered, (iii) unsupported billing of high throughput COVID 19 testing codes, and (iv) misrepresentation of place of service are independent of—and do not rely on—Genesis's posted cash price. United pleads those theories as separate bases for recoupment and other relief as set forth below.

26. 23. Genesis also elected to run a needlessly expensive multiplex test for individuals seeking a basic COVID test, without a valid clinical determination that such a test was medically necessary. As a result, Genesis For example, and as discussed below, Genesis needlessly ran ***twelve*** separate tests for a United member who simply needed a COVID test before receiving a facial treatment at a spa. United paid Genesis **$821.59** for this member's blatantly unnecessary ancillary tests.

27. Genesis thus performed unnecessary ancillary tests to—borrowing Metropolitan's words—"maximize out-of-network revenue,"[7][6] charging United **$1,150** per multiplex test.

[7][6] https://metrohealthbill.net/about/.

28. ~~24.~~ Typically, an out of network laboratory's ability to price gouge an insurance company is market checked by the out-of-pocket costs that health plan members are responsible for, which generally exceed the out-of-pocket costs associated with an in-network provider. One way that out-of-network laboratories seek to recruit patients for whom they are out of network is to waive out-of-pocket costs, therefore eliminating that market check. In the case of testing covered by the CARES Act, the statute eliminated all out-of-pocket responsibility for patients. For all other testing services, United's plans generally do not cover such services when out-of-pocket costs are waived.

29. ~~25.~~ Counterclaim Defendants' fraudulent and abusive billing conduct is the type of provider billing abuse that increases the cost of healthcare for all participants in the healthcare system: payors like United, state and federal government payors, employers who sponsor health plans, and health plan beneficiaries. As an administrator of health plans, United is on the front lines of identifying and stopping fraudulent, wasteful, and abusive provider billing on behalf of many constituencies in the healthcare system.

30. ~~26.~~ Not surprisingly, Genesis's deceptive acts concerning COVID testing quickly generated media attention. In June 2020, at the height of the pandemic and two months after Genesis doubled its test price to $513.00 per test, the *New York Times* published an exposé entitled "Two Friends in Texas Were Tested For Coronavirus. One Bill Was For $199. The Other? $6,408."~~[8]~~[7] The article shed light on Genesis's price-gouging business model of not only billing for unnecessary services, but also charging cash-paying customers hundreds of dollars less than it was charging customers who paid with insurance.

31. ~~27.~~ Counterclaim Defendants' fraudulent billing practices have also become the subject of a False Claims Act *qui tam* action pending in this District. *See Jensen et al. v. Genesis Laboratory Management et al.*, No. 3:20-cv-15121 (D.N.J. Oct. 28, 2020). The *qui tam* Complaint alleges, among other things, that Genesis and Metropolitan fraudulently billed for medically unnecessary services by "(i) furnishing services in excess of the patient's needs, based on their diagnosis, (ii) furnishing a battery of diagnostic tests, where, based on the diagnosis, only some were needed; and (iii) misrepresenting and/or disregarding the diagnosis and clinical indications to justify the services or products." *Jensen*, ECF No. 32 at 11–12.

32. Each time Genesis (acting directly and through its billing agent, Metropolitan) submitted a claim to United for payment, Genesis affirmatively sought benefits available only to United members under United-administered plans and expressly invoked plan coverage by submitting claims in the member's name, under the member's plan, and pursuant to plan terms. In doing so, Genesis stepped into the shoes of the member and represented—both expressly and by implication—that it was entitled to payment under the applicable benefit plan, that the

~~[8]~~[7] *See* https://www.nytimes.com/2020/06/29/upshot/coronavirus-tests-unpredictable-prices.html.

services billed were covered services, that all conditions precedent to payment were satisfied, and that the information submitted was accurate, complete, and truthful. United relied on those representations in adjudicating and paying claims.

33. ~~28.~~ Nothing in the FFCRA or the CARES Act required United to resign itself to price-gouging for critical health care services during a public health emergency by opportunistic providers, let alone providers like Genesis who are known to have engaged in improper and deceptive billing practices. United is entitled to compensatory damages and the equitable and other relief requested herein. To the extent United (or the ERISA Plans it administers) paid claims in reliance on materially false information—including, for ERISA Plans, claims paid based on Genesis's misstatement of its posted cash price—United is entitled to seek the equitable and other relief requested herein, consistent with ERISA and the Court's March 13, 2026 Order.

**Genesis and Metropolitan's Fraudulent Billing Practices**

34. ~~29.~~ Genesis viewed the CARES Act's payment provision as an opportunity to pad its profits and seized upon it. Genesis admits that in April 2020—immediately upon passage of the FFCRA and CARES Act—it doubled the cash price posted on its website for a basic COVID test from $256.50 to $513. *See* Second Am. Compl. ¶¶ 28-29. By comparison, Quest Diagnostics—one of the largest clinical laboratory testing companies in the country—charged only $125.[98] Additionally, at that time, Medicare was reimbursing $100 per test. Genesis had no reason to immediately double the price on its website other than to profiteer on the hastily drafted and passed emergency legislation.

35. ~~30.~~ Beyond the increase in Genesis's purported posted cash price, however, Counterclaim Defendants' additional improper billing practices further inflated Genesis's profits. Those improper billing practices did not go unnoticed, generating negative media attention and tips from United members noting Genesis's "extremely high price" for a simple COVID test and alleging that Genesis billed for services not rendered.

36. ~~31.~~ Against that backdrop, and in response to member complaints, United opened an investigation into Genesis's billing practices and in June 2020 placed Genesis claims on a pre-payment review flag that required Genesis to submit clinical records substantiating the claims that Genesis submitted. That pre-payment review flag remains in place.

37. ~~32.~~ A coding analysis of claims that Genesis submitted identified multiple irregularities, including insufficient documentation to support the charges billed, upcoding of services, and unbundling (*i.e.*, submitting multiple Current Procedural Technology ("CPT") codes for the component portions of a procedure, rather than a single code that encompasses

---

[98] *See* https://web.archive.org/web/20210330180737/https://www.questdiagnostics.com/home/Covid-19/Pricing/.

those portions, in order to increase payment). Upon information and belief, Genesis relied upon Metropolitan's billing services in connection with submitting certain of those claims.

38. ~~33.~~ United's investigation ultimately revealed multiple improper and deceptive billing trends on Genesis's part.

*Fraudulent "Posted Cash Price" and Overbilling for Testing Services*

39. ~~34.~~ The CARES Act required Genesis to post its cash price—*i.e.*, the price it charged cash-paying customers—to its website. *See* Section 3202(b) of the CARES Act. The CARES Act then directed commercial health insurance companies to pay that posted cash price to laboratories unless they negotiated a different rate. In other words, the CARES Act ~~provided~~provides that in the absence of a separate agreement, United should pay the *same* price as cash paying customers.

40. ~~35.~~ Genesis relied upon a fraudulent purported cash price to defraud United. Although Genesis represented on its website and routinely in its billed charges to United that its cash price was $513.00, evidence gathered during United's investigation revealed that Genesis knowingly misrepresented its posted cash price in violation of the CARES Act, as it charged cash-paying customers far less for the exact same COVID test. Genesis made that misrepresentation specifically to charge United the inflated price and claim entitlement to payment for the misstated price under the CARES Act. It defies logic that Genesis was actually charging cash paying customers the posted cash price given the abundance of alternative testing locations that charged far less than $513.00 per COVID test.

41. ~~36.~~ The photograph below, taken on Genesis's premises in or around September 2020, which was only disclosed as part of discovery in this litigation, makes clear that Genesis's actual cash price for a basic COVID test was $100.00:




42. ~~37.~~ Rather than charge United its actual cash price of $100.00 for a COVID test, however, Genesis routinely charged United a rate more than five times greater. In reliance on the price posted on Genesis's website and the billed charge it submitted to United, United paid certain claims at the inflated rate.

43. ~~38.~~ Genesis's overbilling was not limited to its COVID testing services, as Genesis—using Metropolitan's billing services—also routinely billed United inflated charges for laboratory tests not related to COVID. For example, Member M.S. received a quantitative immunoassay analyte test on March 19, 2020. Genesis charged United ***$750.00*** for that service, a price that was ***nearly nine times*** the Medicare rate of $86.35 for the same service.

44. ~~39.~~ Member M.S. also received a fecal fat qualitative test that same day. Even though Medicare charged only ***$5.10*** for that service, Genesis charged United ***$100.00 – a nearly 2000% markup of the Medicare price***.

45. ~~40.~~ Similarly, Member M.K. received a gastrointestinal pathogen multiplex panel on September 1, 2023. Genesis charged United ***$1,051.00*** for that test, a price that was ***four times*** the Medicare rate of $262.99 for the same test.

*Duplicate Billing*

46. 41. United's investigation also revealed duplicate payments in which both Genesis and another laboratory, hospital, or provider group both billed and received payment for the same member, the same date of service, and the same COVID-19 *test*. Specifically, Genesis would bill and receive diagnostic testing event. These duplicate payments do not reflect two separate tests legitimately performed on the same day; rather, as reflected by member complaints and investigative findings, they reflect multiple claims submitted for a single testing encounter and a single specimen/testing event. As set forth below, Genesis billed for COVID-19 tests that it did not independently perform; Genesis only processed specimens that had been collected by other facilities, yet Genesis billed United as though it had provided the complete testing service.

47. United's investigation was opened based on complaints from members who reported that they visited Austin Emergency Center ("AEC") for a COVID-19 test and subsequently discovered that both AEC and Genesis submitted claims to United for the same date of service.

48. Upon information and belief, the billing relationship between AEC and Genesis operated as follows: Patients visited AEC for COVID-19 testing. AEC collected the specimen from the patient and billed United for the COVID-19 test. AEC then transmitted the specimen to Genesis for laboratory processing. Genesis also billed United for a COVID-19 test—even though Genesis only received and processed the specimen for which Genesis and Metropolitan knew that AEC had already collected and billed. Genesis did not independently collect specimens or provide the complete COVID-19 testing service for which it billed. Thus, Genesis and Metropolitan knowingly submitted claims to United for the same patient and same date of service for which AEC had already submitted claims, resulting in United paying twice for a

single testing event.

49. Upon information and belief, Genesis billed as if it independently provided a complete COVID-19 testing service, but in reality, it only processed specimens that it knew came from AEC. Genesis used incorrect POS codes to make it appear the specimens were collected at the Genesis laboratory when they were actually collected elsewhere. Genesis's actions were intentional and designed to induce United to pay claims for services not actually rendered.

50. Critically, the members who complained did not receive more than one COVID-19 test on the dates in question. Only one specimen was collected and only one test was performed onsite, yet United was billed twice—once by AEC and once by Genesis.

51. Upon information and belief, AEC is not the only provider that performed COVID-19 diagnostic services for which Genesis submitted duplicate claims.

52. The duplicative billing is demonstrated by the billing codes submitted by each facility. Genesis billed United and received payment under ~~a CPT~~HCPCS code ~~(e.g.~~ U0004~~)~~ ~~while another laboratory or provider group would bill and receive~~, which represents a high-throughput COVID-19 diagnostic test. At the same time, AEC or other providers billed and received payment under ~~the same or a~~ separate ~~but related~~COVID-19 testing codes—such as CPT code ~~(e.g.~~ 87635~~,~~ or HCPCS codes U0002~~, or~~ and U0003~~)~~ —for the same member and the same date of service. ~~Upon information and belief, Genesis relied upon Metropolitan's billing services in connection with submitting certain of those claims.~~ These codes are alternative billing pathways for the performance of a single COVID-19 diagnostic test and are not intended to be billed cumulatively for the same specimen on the same day. As a result, United paid multiple claims for what was a single COVID-19 testing event.

~~42. United requires laboratories to use a Place of Service (POS) code that identifies where the specimen was obtained. Rather than indicate that a specimen had been taken at a separate facility, Genesis instead generally used a POS code that represented that the specimens it tested were taken at the Genesis laboratory.~~

53. Genesis's duplicative billing violated established healthcare billing guidelines, including the National Correct Coding Initiative ("NCCI") guidelines promulgated by the Centers for Medicare & Medicaid Services ("CMS"). The NCCI guidelines establish correct coding practices to prevent improper payment of claims, including claims for duplicative services. Under the NCCI guidelines, a laboratory may not bill separately for a test when another provider has already billed for the same test for the same patient on the same date of service. Under the applicable guidelines, Genesis was permitted to bill only for the laboratory processing of a specimen referred to it by a collecting facility—not to bill as if it had independently provided a complete COVID-19 testing service, including specimen collection.

54. Genesis's duplicative billing also violated United's Laboratory Services Reimbursement Policy, which is incorporated by reference into United's provider agreements and reimbursement protocols. United's Laboratory Services Reimbursement Policy provides that laboratories may only bill for services actually rendered and may not bill for services that duplicate those billed by another provider.

55. Genesis and Metropolitan knew at the time Genesis submitted its claims that AEC or another provider had already billed United for the same COVID-19 test. Genesis and Metropolitan knew this because: (a) Genesis received the specimens from AEC and other collection sites rather than collecting specimens directly from patients, and therefore knew that another facility had already provided specimen collection services and billed United for the same

patients; (b) Genesis used POS codes falsely representing that specimens were collected at the Genesis laboratory, when in fact the specimens were collected at AEC or other third-party collection sites, thereby affirmatively misrepresenting to United the nature of the services Genesis provided; (c) Metropolitan, Genesis's billing company, prepared and submitted the claims on Genesis's behalf and selected the billing codes that contained those misrepresentations; and (d) by virtue of its common ownership with Genesis, Metropolitan had access to information regarding the source of specimens and the involvement of other providers, and knew that the claims it submitted were duplicative of claims already submitted by other providers.

56. By submitting claims for COVID-19 tests that had already been billed by other providers, Genesis and Metropolitan (a) billed for services Genesis did not actually perform, misrepresenting to United that Genesis independently collected and processed the specimens when in fact AEC or another provider had already performed and billed for the specimen collection and testing services; (b) knowingly billed for duplicative services that Genesis and Metropolitan knew Genesis was not entitled to bill for under applicable coding guidelines and United's reimbursement policies; and (c) used false POS codes and billing codes to conceal the duplicative nature of the claims and induce United to pay for services not rendered by Genesis.

57. ~~43.~~ As a result of Counterclaim Defendants' improper claim submission, United paid twice for the same service—to Genesis and to a duplicate facility.

58. ~~44.~~ For example, on or around March 27, 2020, Genesis billed three procedure codes, including one for a COVID test, in connection with a testing encounter for United member F.B. Another laboratory—which, upon information and belief, also contracted with Metropolitan for billing services—~~billed for the exact same procedure codes under the same~~

~~servicing provider~~submitted a claim to United for the specimen collection and testing services. Genesis also submitted a claim to United for the same date of service, using POS codes representing that the specimen was collected at the Genesis laboratory. Member F.B. did not receive more than one COVID-19 test on that date. United ultimately paid both Genesis and the other laboratory $184.13 for that same testing encounter, resulting in a duplicative payment to Genesis.

59. ~~45.~~ On or around May 26, 2020, Genesis billed for one COVID test sought by Member A.J. under CPT code U0004, and United ultimately paid Genesis $256.65 for that test. But a hospital also billed United for that exact same COVID test: The hospital's claim was tied to the same member and had the same date of service as the claim Genesis submitted, but reflected a similar but separate procedure code (87635) and a different place of service code. Member A.J. did not receive more than one COVID-19 test on that date. United paid the hospital $286.83 for that same COVID test.

60. ~~46.~~ Similarly, Genesis billed for one COVID test sought by Member A.B. on or around December 17, 2021, and United ultimately paid Genesis $550.50 for that test. But a different laboratory also billed United for that exact same COVID test. Member A.B. did not receive more than one COVID-19 test on that date. United paid the other laboratory—which submitted its claim associated with the same member using the same date of service and procedure code—$150.00, resulting in a duplicative payment to Genesis.

*Unnecessary Ancillary Services*

61. ~~47.~~ For United members seeking a COVID test, Genesis also elected to bill for a needlessly expensive multiplex test—which allegedly detects 22 other respiratory pathogens beyond COVID-19—over a basic PCR test, without a valid clinical determination that the

multiplex test was medically necessary. ~~In fact, Genesis has not established that any patient who received the test benefitted medically from the test at all.~~ United's investigation found that those additional tests were not supported by required physician orders or laboratory requisitions identifying the tests to be performed, and/or were billed in a manner that was inconsistent with applicable coding and billing guidelines (including unbundling). By submitting claims for these ancillary tests, Genesis and Metropolitan affirmatively represented to United that the tests had been ordered by a physician, were medically necessary, and were supported by appropriate clinical documentation—when in fact no physician had ordered the tests and no clinical documentation supported their medical necessity. Genesis and Metropolitan knew these representations were false at the time they submitted each claim.

62. ~~48. Upon information and belief, discovery will show that the~~The multiplex test is mostly, if not entirely, useless for most patients. ~~Instead, it is designed purely to pad Genesis' profits, as~~ Genesis's billing for add-on tests was driven by revenue considerations, including billing tests individually (including tests that are components of panel testing) in a manner that increased reimbursement (Genesis billed for the more expensive multiplex test at a rate of $1,150.00 per test). United's investigation found pervasive documentation and coding defects associated with these claims, including missing orders/requisitions, unbundling, and inaccurate POS coding.

63. ~~49.~~ Other physicians have recognized that the panel test "should only be used for the critically ill or immune-compromised, so we don't over-test and generate too large of a bill for our patients."[~~10~~9]

[~~10~~9] Sarah Kliff, *These Towns Trusted a Doctor to Set Up Covid Testing. Sample Patient Fee: $1,944*, N.Y. TIMES, Nov. 10, 2020 (updated Nov. 12, 2020), https://www.nytimes.com/2020/11/10/upshot/covid-testing-doctor-fees.html.

64. During United's investigation, 43 members were interviewed regarding the services they received. Of those 43 members, 34 reported that the only test ordered was a COVID-19 test. Despite this, Genesis submitted claims to United for multiple additional tests for these same members—tests that the members did not request, that no physician ordered, and that Genesis billed for without authorization.

65. By submitting claims representing that these ancillary tests were properly provided, Genesis and Metropolitan made material misrepresentations to United regarding the services rendered and the propriety of the claims. Specifically, by submitting each claim, Genesis and Metropolitan represented to United that: (a) the ancillary tests had been ordered by a physician or other authorized healthcare provider; (b) the tests were medically necessary and clinically appropriate for the patient; (c) the claims were supported by required documentation, including physician orders and laboratory requisitions; and (d) the claims were billed in accordance with applicable coding guidelines. Each of these representations was false.

66. Additionally, Genesis's and Metropolitan's ancillary testing billing practices violated the NCCI guidelines promulgated by CMS due to their practice of unbundling. The NCCI guidelines establish correct coding methodologies to prevent improper payments, including payments for unbundled services. Under the NCCI guidelines, when multiple laboratory tests are performed together as part of a single panel, the provider must bill for the panel using a single bundled code rather than billing for each component test individually. Genesis and Metropolitan (1) were required to comply with the NCCI guidelines when submitting claims to United, (2) expressly and impliedly represented that the claims complied with applicable coding requirements when they submitted claims to United, and (3) knew that United relied on those representations when making claims determinations. Their failure to

comply with NCCI guidelines rendered their claims false and misleading.

67. United's investigation reviewed 96 sample claim lines submitted by Genesis. Of those 96 claim lines, only 4 were supported by the documentation and coding requirements, and 92 were unsupported. After removing claims that were unsupported solely due to Place of Service issues, 83 claim lines remained unsupported for substantive reasons—a 96% unsupported rate.

68. Of the unsupported claims, 58 claim lines were attributable to unbundling. Thus, Genesis billed component codes individually for services that should have been billed as a single multi-component code under NCCI guidelines. By billing each component test individually rather than using the appropriate bundled code, Genesis inflated its reimbursement in violation of federal coding standards.

69. Genesis's and Metropolitan's ancillary testing billing practices also violated United's Laboratory Services Reimbursement Policy. That policy requires, among other things, that laboratory services be supported by a physician's order or laboratory requisition that specifically identifies the tests to be performed. The policy further requires that laboratories bill only for services that are medically necessary and supported by appropriate clinical documentation. Genesis and Metropolitan (1) were required to comply with United's Laboratory Services Reimbursement Policy when submitting claims to United, (2) expressly and impliedly represented that the claims complied with the policy when they submitted claims to United, and (3) knew that United relied on those representations of compliance with the policy when making claims determinations. Their failure to comply with the policy rendered their claims false and misleading. United's investigation found that medical records submitted by Genesis frequently did not include a physician's order or lab requisition specifically listing what tests were to be

performed. Per United's policy, laboratory tests performed in the absence of physician documentation or physician orders are not reimbursable. And without such documentation, Genesis could not establish that the ancillary tests it billed for were ordered by a physician or were otherwise medically necessary. Member interviews conducted during United's investigation corroborated that Genesis's claims frequently included add-on testing beyond what was requested: out of 43 members interviewed, 34 reported that the only test ordered was a COVID-19 test, yet Genesis billed United for multiple additional tests for those same members. This evidence demonstrates that Genesis and Metropolitan knowingly submitted claims for ancillary tests that were never ordered by any physician.

70. United's investigation and coding review identified unbundling of respiratory pathogen panel testing, including instances in which Genesis billed component codes that are not separately reportable when multiplex testing is performed and should be reported using CPT 87631–87633. For example, under the NCCI Policy Manual, CPT 87501–87503 for influenza viral target testing shall not be reported separately when multiplex testing is performed for multiple respiratory viral targets including influenza viral targets.

*Other Improper Billing Practices*

71. Aside from the examples above, Genesis's billing practices contained other material misrepresentations. For example, Genesis submitted claims using HCPCS code U0004, which represents COVID-19 testing performed using "high-throughput technology." High-throughput technology refers to automated testing platforms capable of processing large volumes of tests simultaneously.

72. United's investigation into Genesis found that 20 claim lines were unsupported because the records did not demonstrate that the high-throughput technology described by code

U0004 was actually used. Specifically, two of the three possible tests listed in Genesis's records did not meet the high-throughput technology requirement. By billing under code U0004, Genesis represented that it used high-throughput technology when it did not, thereby fraudulently obtaining reimbursement at a higher rate than it was entitled to receive.

73. United's investigation also identified significant date discrepancies in Genesis's records that further demonstrate the fraudulent nature of its billing practices. In one case, a requisition showed a specimen collection date, but the laboratory report showed a date seven days later—and Genesis submitted claims for and was paid for both dates. In another case, test results were populated in Genesis's system seven months after the purported collection date. These discrepancies are inconsistent with legitimate laboratory operations; Genesis submitted claims for testing that did not occur as represented.

*Twelve Tests for a Simple Spa Treatment*

74. ~~50. For example,~~The cumulative impropriety of Genesis's practices is well illustrated by the experience of United member O.C. Member O.C. filed a complaint with United in August 2020 regarding the high cost of a COVID test she received that Genesis billed. The member reported that she provided a throat swab for a COVID-19 diagnostic test that a spa requested prior to scheduling a facial treatment at ~~a~~the spa even though she was not symptomatic at the time. Genesis submitted a claim for reimbursement for ***twelve*** separate tests for the member. United ultimately paid Genesis ***$821.59*** for this testing encounter for an asymptomatic patient who merely wished to get a facial. Moreover, the Nurse Practitioner who referred the test to Genesis did not submit any claim for the member.

75. There was no medical justification for any test beyond the one COVID-19 test that Member O.C. requested. No physician ordered the additional tests. The Nurse Practitioner

who referred Member O.C. for testing did not order or bill for any additional diagnostic services. The additional tests were not medically necessary for an asymptomatic patient seeking a pre-spa COVID-19 test.

76. By submitting claims for these additional 12 tests when only a COVID-19 test was requested, Genesis represented—expressly and/or by implication—that the billed services were ordered and properly billable and that the submitted claim information (including coding and any required supporting documentation) was accurate and complete. In this instance, the additional tests were not ordered by a physician or other authorized provider, and United's payment for those additional tests was made in reliance on the claim information submitted.

77. Member O.C.'s case is not an isolated incident but rather illustrates the systematic nature of Genesis's fraudulent billing practices. As set forth above, 34 of 43 members interviewed confirmed that the only test ordered was a COVID-19 test, yet Genesis billed for multiple additional tests. Genesis engaged in a pattern and practice of billing for ancillary tests that were never ordered, never medically necessary, and in many cases never performed.

78. ~~51.~~ Indeed, United's investigation revealed that when Genesis submitted clinical records in response to the pre-payment requests from United, a large percentage—***68 percent***—of the claims were determined not to be payable because the documentation did not support the services billed. The pre-payment review also found that when Genesis submitted bills for COVID testing—~~upon information and belief,~~ using Metropolitan's services—in conjunction with certain unrelated microbiology tests, ***97 percent*** of the time the records did not support that a physician requested the unrelated tests, that separate samples were collected, and/or tests were performed.

79. ~~52.~~ Counterclaim Defendants' improper, deceptive, and fraudulent billing practices during an unprecedented global pandemic ~~have~~ caused United to overpay Genesis for basic testing services by tens of millions of dollars. United is entitled to compensatory damages and the equitable and other relief it requests herein.

*Metropolitan's Coordinated Conduct*

80. Metropolitan, Genesis's billing company, was an active and knowing participant in the fraudulent billing scheme. Metropolitan was not a passive billing processor; it was an integral part of the coordinated operation to inflate claims and defraud United. Metropolitan's specific conduct in furtherance of the scheme included: (a) preparing and submitting claims to United on Genesis's behalf that contained material misrepresentations; (b) selecting billing codes, including POS codes that misrepresented where specimens were collected and HCPCS codes that misrepresented the testing technology used; (c) submitting claims for duplicative services that Metropolitan knew had already been billed by other providers; (d) submitting claims for ancillary tests that Metropolitan knew were not ordered by any physician; (e) unbundling panel tests into individual component codes to inflate reimbursement; and (f) failing to ensure that the claims it submitted complied with the NCCI guidelines and United's Laboratory Services Reimbursement Policy, despite its obligation to do so.

81. Metropolitan and Genesis share common ownership. Upon information and belief, both entities are owned and controlled by Rajiv Uppal, M.D. By virtue of this common ownership, Metropolitan had full knowledge of Genesis's testing operations, specimen sources, and billing practices.

82. Metropolitan's website advertises that it is "well-equipped to maximize out-of-network revenue." This marketing language reflects Metropolitan's role in the scheme:

Metropolitan's expertise was specifically deployed to inflate billing amounts and maximize reimbursements from out-of-network insurers like United.

83. Metropolitan prepared and submitted the claims at issue on Genesis's behalf. Metropolitan selected the billing codes, including the POS codes that misrepresented the location of specimen collection and the HCPCS codes that misrepresented the testing technology used. Metropolitan submitted the claims that billed for duplicative services and unbundled ancillary tests. These are affirmative misrepresentations that Metropolitan made to United to induce United to pay more than it should have. Metropolitan knew these representations were false because, by virtue of its common ownership with Genesis and its role in preparing claims, Metropolitan had access to information showing that: (a) specimens were collected at facilities other than Genesis; (b) other providers had already billed for the same testing services; (c) ancillary tests were not supported by physician orders; and (d) the claims did not comply with applicable billing guidelines.

84. Metropolitan was responsible for ensuring that the claims it submitted complied with applicable billing guidelines, including the NCCI guidelines and United's Laboratory Services Reimbursement Policy, and it knowingly failed to do so.

85. By virtue of its common ownership with Genesis, its role in preparing and submitting the fraudulent claims, and its self-described expertise in maximizing out-of-network revenue, Metropolitan is jointly and severally liable with Genesis for the fraudulent billing scheme alleged herein.

**The Impacted Health Benefit Plans**

86. ~~53.~~ United is authorized to bring this action to recover overpayments caused by Counterclaim Defendants' conduct on behalf of United's fully insured and self-funded

health plans.

87. ~~54.~~ United brings this action on its own behalf as the provider of fully-insured health plans and as the claims administrator for self-funded, employer-established health plans that retain United as a third-party administrator to process employees' and their families' healthcare claims.

88. ~~55.~~ United provides claim administration services for the self-funded plans pursuant to Administrative Services Agreements ("ASAs"), which identify the rights and obligations of United and the plan sponsors.

89. ~~56.~~ Among other things, the ASAs assign to United all rights to pursue all overpayments via litigation or arbitration.

90. ~~57.~~ United's ASAs typically state:

> Customer delegates to United the discretion and authority to develop and use standards and procedures for any recovery opportunity, including but not limited to whether or not to seek recovery, what steps to take if United decides to seek recovery, whether to initiate litigation or arbitration, the scope of such litigation or arbitration, which legal theories to pursue in such litigation or arbitration, and all decisions relating to such litigation or arbitration, including but not limited to, whether to compromise or settle any litigation or arbitration, and the circumstances under which a claim may be compromised or settled for less than the full amount of the potential recovery. In all instances where United pursues recovery through litigation or arbitration, Customer, on behalf of itself and on behalf of its Plans, will be deemed to have granted United an assignment of all ownership, title, and legal rights and interests in and to any and all claims that are the subject matter of the litigation or arbitration.

91. ~~58.~~ The ERISA plans at issue in this litigation include this or substantially similar language. Beyond the authority entrusted to United under their ASAs with plan sponsors, United has a concrete business interest in paying only valid claims under the ASO plans it administers.

**FIRST COUNTERCLAIM**
**RECOUPMENT OF OVERPAYMENTS UNDER 29 U.S.C. § 1132(a)(3)**

92. 59. United incorporates by reference the allegations set forth in the preceding paragraphs of the Counterclaims.

93. 60. United, acting as the administrator of ERISA-governed plans ("ERISA Plans"), seeks to enforce the terms of those plans and recover overpayment amounts made by the ERISA Plans to Genesis.

94. 61. The ERISA Plans allow United to recover overpayments for claims submitted by medical providers.

95. 62. United was induced to make the payments to Genesis as a result of Genesis's false, deceptive, and/or unsubstantiated claims. As alleged herein, Genesis obtained and retained overpayment amounts that are traceable to specific claim payments made from ERISA Plan assets to Genesis for particular identified claims and dates of service. There is an equitable right of recovery on behalf of the ERISA Plans as to those payments.

63. As a result of Genesis's false claim submissions and improper, deceptive, and fraudulent billing practices, Genesis improperly received from United payment ofand retains ERISA Plan assets in an amount to be determined at trial, including specifically identifiable funds United paid on particular claims for which no reimbursement (or a lesser reimbursement) was due under the terms of the ERISA Plans and applicable law.

96. 64. Those ERISA Plan assets belong to United and/or the ERISA Plans because, as a result of Genesis's false, deceptive, and/or unsubstantiated claims, no reimbursement was due to Genesis under the terms of the ERISA Plans.

97. 65. Genesis should not be permitted to retain the benefit of those ERISA Plan assets, which were not due under the terms of the ERISA Plans.

~~66.~~ An equitable lien by agreement exists in accordance with the ERISA Plan provisions governing recoupment of overpayments.

98. ~~67.~~ Genesis is obligated, based on equitable principles and/or the ERISA Plans' overpayment provisions, to return to United the claim payments Genesis received for services to United members billed under those ERISA Plans.

**SECOND COUNTERCLAIM**
**RECOUPMENT OF OVERPAYMENTS UNDER NON-ERISA PLANS**

99. ~~68.~~ United incorporates by reference the allegations set forth in the preceding paragraphs of the Counterclaims.

100. ~~69.~~ United administers certain plans that are exempt from, or otherwise not governed by, ERISA ("Non-ERISA Plans").

101. ~~70.~~ United seeks to enforce the terms of the Non-ERISA Plans and recover overpayment amounts made by United to Genesis~~.~~ based on claim submissions that were false, misleading, unsubstantiated, duplicative, and/or otherwise improper as alleged herein. Specifically, this claim is premised on: (a) Genesis's duplicative billing for COVID-19 tests already billed by other providers; (b) Genesis's billing for ancillary tests that were not ordered by any physician and were not medically necessary; (c) Genesis's unbundling of panel tests in violation of NCCI guidelines; and (d) Genesis's misuse of billing codes to misrepresent the services actually provided. This claim is not premised on Genesis's posted cash price under CARES Act § 3202.

102. ~~71.~~ As a result of Genesis's false claim submissions and improper, deceptive, and fraudulent billing practices, Genesis improperly received from United overpayments on behalf of members who participated in the Non-ERISA Plans in an amount to be determined at trial.

103. ~~72.~~ Those funds belong to United and/or the Non-ERISA Plans because, as a result of Genesis's false, deceptive, and/or unsubstantiated claims, no reimbursement was due to Genesis under the terms of those Plans.

104. ~~73.~~ Genesis should not be permitted to retain the benefit of those funds, which were not due under the terms of the Non-ERISA Plans.

105. ~~74.~~ Genesis is obligated, based on equitable principles such as unjust enrichment, restitution, and disgorgement, to return to United the claim payments Genesis received for services to United members billed under the Non-ERISA Plans.

106. United pleads this claim with particularity as to Counterclaim Defendants' fraudulent conduct. (i) **Who**—Genesis and Metropolitan, acting jointly through personnel responsible for claim preparation and submission; (ii) **What**—false and misleading claim submissions seeking payment from United under non-ERISA plans for duplicative COVID-19 tests, ancillary tests not ordered by any physician, and improperly coded or unbundled services; (iii) **When**—during the claim periods identified herein, including specific claims and dates of service reviewed and audited by United; (iv) **Where**—in electronic and paper claims and supporting documentation submitted to United; and (v) **How**—by submitting claims that invoked member coverage under United-administered plans and thereby represented that Genesis was entitled to payment under those plans, when in fact Counterclaim Defendants knew payment was not authorized because (1) the claims did not comply with NCCI guidelines or United's Laboratory Services Reimbursement Policy and (2) the services billed were not properly ordered, medically necessary, or reimbursable.

**THIRD COUNTERCLAIM**
**INSURANCE FRAUD IN VIOLATION OF THE NEW JERSEY INSURANCE FRAUD PREVENTION ACT, N.J.S.A. 17:33A-1, et seq.**

107. 75. United incorporates by reference the allegations set forth in the preceding paragraphs of the Counterclaims.

108. 76. From the outset of the pandemic, Counterclaim Defendants entered into an unlawful scheme to defraud United by submitting or causing to be submitted claims to United seeking reimbursement for testing services allegedly provided to United members reflecting charges that were materially false, as Genesis represented that the claims were properly billed, that the services were medically necessary and clinically appropriate, and that the charges for COVID testing services reflected Genesis's posted cash price.. Specifically, Genesis and Metropolitan: (a) submitted claims for COVID-19 tests that Genesis did not perform, billing for complete testing services when Genesis only processed specimens that other providers had already collected and billed for; (b) submitted claims for ancillary tests that were never ordered by any physician, representing that the tests were ordered, medically necessary, and supported by required documentation when they were not; (c) unbundled panel tests into individual component codes in violation of NCCI guidelines to inflate reimbursement; and (d) used false POS codes and billing codes to misrepresent the nature and location of the services Genesis actually provided.

109. 77. Counterclaim Defendants' misconduct violated the IFPA, N.J.S.A. 17:33A-1 to -30.

110. 78. Counterclaim Defendants are persons or practitioners within the IFPA's meaning and committed, participated in, solicited others to engage in, and knowingly assisted, conspired with, or urged others to commit the fraudulent and wrongful acts set forth herein.

111. 79. At all times material to its Counterclaims, United was an insurance company within the IFPA's meaning and paid insurance claims in reasonable reliance on and as a result of

the false, misleading, and incomplete claims submitted by or caused to be submitted by Counterclaim Defendants.

112. ~~80.~~ In violation of the IFPA, Counterclaim Defendants knowingly submitted or caused to be submitted to United claims for payment that contained material misrepresentations~~, as~~. Specifically, by submitting each claim, Genesis and Metropolitan represented that ~~the claims were properly billed, that~~: (a) Genesis independently collected specimens and performed the COVID-19 tests for which it billed, when in fact Genesis only processed specimens collected by other providers who had already billed for the same testing service; (b) ancillary tests had been ordered by a physician or other authorized healthcare provider, when in fact no physician had ordered the tests; (c) the services billed were medically necessary and ~~clinically appropriate, and that the charges for COVID testing services reflected Genesis's posted cash price.~~supported by required clinical documentation, when in fact the documentation did not support medical necessity; and (d) the claims were billed in accordance with applicable coding guidelines, including the NCCI guidelines and United's Laboratory Services Reimbursement Policy, when in fact they were not.

113. ~~81.~~ In addition, Genesis and Metropolitan intentionally concealed and failed to disclose material events, occurrences, and other information that affected their right to payment in violation of the IFPA. ~~For example, from March 2020 through at least July 2024, Genesis sought payment for its COVID testing services at rates that far exceeded its true posted cash price.~~ Specifically, Genesis and Metropolitan concealed that: (a) specimens were collected by AEC and other providers rather than by Genesis; (b) other providers had already submitted claims to United for the same COVID-19 tests for which Genesis billed; (c) ancillary tests were

not ordered by any physician; and (d) the claims did not comply with applicable billing guidelines.

114. ~~82.~~ In submitting or causing to be submitted insurance claims to United for payment, Counterclaim Defendants acted knowingly and intended that United rely on the information contained in the false health insurance claims in issuing payment for those claims.

115. ~~83.~~ In reasonable reliance on and as a result of the material misrepresentations related to the false health insurance claims that Counterclaim Defendants submitted or caused to be submitted to United, United overpaid Genesis at least $30 million.

116. ~~84.~~ As a result of Counterclaim Defendants' fraud and violations of the IFPA, United has suffered damages including, but not limited to, all amounts that United paid as a result of the submission, or causing others to submit, false and fraudulent claims for reimbursement, costs of investigation, costs of suit, and attorneys' fees, all of which are recognized as compensatory damages under the IFPA.

117. ~~85.~~ As a result of Counterclaim Defendants' fraud and violations of the IFPA, United is entitled to an award of treble damages under the IFPA.

118. United pleads this claim with particularity as to Counterclaim Defendants' improper conduct. (i) **Who**—Genesis and Metropolitan, acting jointly through personnel responsible for claim preparation and submission; (ii) **What**—false and misleading claim submissions seeking payment from United for duplicative COVID-19 tests, ancillary tests not ordered by any physician, and improperly coded or unbundled services; (iii) **When**—during the claim periods identified herein, including specific claims and dates of service reviewed and audited by United; (iv) **Where**—in electronic and paper claims and supporting documentation submitted to United; and (v) **How**—by knowingly submitting claims that sought insurance

benefits under United plans and thereby represented entitlement to payment, when in fact Counterclaim Defendants knew payment was not authorized because (1) the claims did not comply with NCCI guidelines or United's Laboratory Services Reimbursement Policy and (2) the services billed were not properly ordered, medically necessary, or reimbursable.

**FOURTH COUNTERCLAIM**
**COMMON LAW FRAUD**

119. ~~86.~~ United incorporates by reference the allegations set forth in the preceding paragraphs of the Counterclaims.

120. ~~87.~~ From the outset of the pandemic, Counterclaim Defendants entered into an unlawful scheme to defraud United by submitting or causing to be submitted claims to United seeking reimbursement for testing services allegedly provided to United members ~~reflecting charges~~ that were materially false~~, as~~. Genesis—in concert with Metropolitan, its billing company—~~represented that the claims were properly billed,~~made the following material misrepresentations: (a) that Genesis independently collected specimens and performed the COVID-19 tests for which it billed, when in fact Genesis only processed specimens collected by other providers who had already billed for the same testing service; (b) that ancillary tests had been ordered by a physician, when in fact no physician had ordered the tests; (c) that the services billed were medically necessary and ~~clinically appropriate, and that the charges for COVID testing services reflected Genesis's posted cash price.~~supported by required clinical documentation, when they were not; and (d) that the claims were billed in accordance with applicable coding guidelines, when they were not.

121. ~~88.~~ Counterclaim Defendants' improper, deceptive, and fraudulent billing practices have caused United to overpay Genesis for basic testing services.

~~89. Section 3203(b) of the CARES Act required Genesis to make public its cash price for COVID diagnostic tests. *See* 45 C.F.R. § 182.20.~~

~~90. Genesis, however, did not comply with Section 3203(b) of the CARES Act. Instead, Genesis posted a cash price of $513.00 for a COVID test to its website—and Counterclaim Defendants billed United at that rate—then charged cash-paying customers $100.00 for the same test.~~

~~91. Genesis knew that it was misrepresenting its posted cash price for its COVID testing services—and Counterclaim Defendants knew that they were misrepresenting that the claims were properly billed—when United was charged a rate more than five times greater than the price Genesis charged cash-paying customers for the same service, and Counterclaim Defendants intended that United rely upon their misrepresentations in paying Genesis's inflated charges.~~

122. ~~92.~~ Counterclaim Defendants ~~also~~ knew that Genesis was billing United for testing services billed by another provider, causing United to pay twice for the same test.

123. ~~93.~~ Genesis also knew that it was up-charging United members seeking a basic COVID test by electing to perform a multiplex panel test instead, without justification that the more expensive test was medically necessary or clinically appropriate.

124. ~~94.~~ United reasonably relied upon Counterclaim Defendants' misrepresentations that Genesis's claims were properly billed, reflected Genesis's true pricing, and were medically necessary and clinically appropriate in paying certain of Genesis's billed charges.

125. ~~95.~~ As a result of Counterclaim Defendants' fraudulent billing, United has been injured in an amount to be determined at trial.

126. United pleads this claim with particularity as to Counterclaim Defendants' fraudulent conduct. (i) **Who**—Genesis and Metropolitan, acting jointly through personnel

responsible for claim preparation and submission; (ii) **What**—material misrepresentations that services billed were ordered, medically necessary, non-duplicative, and properly coded; (iii) **When**—at the time of each claim submission and related billing communication during the relevant period; (iv) **Where**—in electronic and paper claims and supporting documentation submitted to United; and (v) **How**—by knowingly submitting claims that sought insurance benefits under United plans and thereby represented entitlement to payment, when in fact Counterclaim Defendants knew payment was not authorized because (1) the claims did not comply with NCCI guidelines or United's Laboratory Services Reimbursement Policy and (2) the services billed were not properly ordered, medically necessary, or reimbursable.

**FIFTH COUNTERCLAIM**
**FRAUDULENT MISREPRESENTATION**

127. 96. United incorporates by reference the allegations set forth in the preceding paragraphs of the Counterclaims.

128. 97. Counterclaim Defendants submitted or caused to be submitted claims to United seeking reimbursement for the testing services allegedly provided to United members reflecting charges that were materially false, as. Genesis—in concert with Metropolitan, its billing company—misrepresented that the claims were properly billed,made the following material misrepresentations: (a) that Genesis independently collected specimens and performed the COVID-19 tests for which it billed, when in fact Genesis only processed specimens collected by other providers who had already billed for the same testing service; (b) that ancillary tests had been ordered by a physician, when in fact no physician had ordered the tests; (c) that the services billed were medically necessary and clinically appropriate, and that the charges for COVID

~~testing services reflected Genesis's posted cash price.~~ supported by required clinical documentation, when they were not; and (d) that the claims were billed in accordance with applicable coding guidelines, including the NCCI guidelines and United's Laboratory Services Reimbursement Policy, when they were not.

129. ~~98.~~ When Counterclaim Defendants submitted or caused to be submitted each claim to United, they knew that the claims were false and misleading because Genesis sought payment ~~at rates that far exceeded its true posted cash price,~~ for services that were not medically necessary or clinically appropriate~~,~~ and for services billed by another provider.

130. ~~99.~~ Counterclaim Defendants failed to disclose material information regarding the testing services for which United was billed ~~and the true pricing associated with those services~~.

131. ~~100.~~ Counterclaim Defendants submitted or caused to be submitted the claims to United with the intent to defraud United by inducing United to rely on the false representations in paying the false and misleading charges.

132. ~~101.~~ United reasonably relied on Counterclaim Defendants' material false statements and omissions and paid certain of the false and misleading claims submitted by Genesis.

133. ~~102.~~ In reliance on such fraudulent conduct, United was damaged in an amount to be determined at trial.

134. United pleads this claim with particularity as to Counterclaim Defendants' fraudulent conduct. (i) **Who**—Genesis and Metropolitan, acting jointly through personnel responsible for claim preparation and submission; (ii) **What**—false statements in claims that services billed were ordered, medically necessary, non-duplicative, and properly coded; (iii) **When**—at the time of each claim submission and related billing communication during

the relevant period; (iv) **Where**—in electronic and paper claims and supporting documentation submitted to United; and (v) **How**—by knowingly submitting claims that sought insurance benefits under United plans and thereby represented entitlement to payment, when in fact Counterclaim Defendants knew payment was not authorized because (1) the claims did not comply with NCCI guidelines or United's Laboratory Services Reimbursement Policy and (2) the services billed were not properly ordered, medically necessary, or reimbursable.

## SIXTH COUNTERCLAIM
## FRAUDULENT CONCEALMENT

135. ~~103.~~ United incorporates by reference the allegations set forth in the preceding paragraphs of the Counterclaims.

136. ~~104.~~ Counterclaim Defendants submitted or caused to be submitted claims to United seeking reimbursement for the testing services allegedly provided to United members ~~reflecting charges~~ that were materially false. Counterclaim Defendants concealed that ~~the claims were not properly billed, concealed that~~: (a) specimens were collected by AEC and other providers rather than by Genesis; (b) other providers had already submitted claims to United for the same COVID-19 tests for which Genesis billed; (c) ancillary tests were not ordered by any physician; (d) the services were not ~~for~~ medically necessary and ~~clinically appropriate tests, and concealed Genesis's true posted cash price.~~ were not supported by required clinical documentation; and (e) the claims did not comply with applicable billing guidelines, including the NCCI guidelines and United's Laboratory Services Reimbursement Policy.

137. ~~105.~~ When Counterclaim Defendants submitted or caused to be submitted each claim to United, they knew that they were concealing material facts about the claims because

Genesis sought payment ~~at rates that far exceeded its true posted cash price,~~ for services that were not medically necessary or clinically appropriate~~,~~ and for services billed by another provider.

138. ~~106.~~ Counterclaim Defendants concealed and failed to disclose material information regarding the testing services for which United was billed ~~and the true pricing associated with those services~~.

139. ~~107.~~ Counterclaim Defendants submitted or caused to be submitted the claims to United with the intent to defraud United by inducing United to rely on the claims submitted without the benefit of the concealed information.

140. ~~108.~~ United took action by paying claims in justifiable reliance on the concealment and paid certain of the false and misleading claims submitted by Genesis.

141. ~~109.~~ In reliance on such fraudulent conduct, United was damaged in an amount to be determined at trial.

142. United pleads this claim with particularity as to Counterclaim Defendants' fraudulent conduct. (i) **Who**—Genesis and Metropolitan, acting jointly through personnel responsible for claim preparation and submission; (ii) **What**—the concealment of material facts, including that tests were duplicative, not ordered by any physician, not medically necessary, or not performed as billed; (iii) **When**—at the time of each claim submission and related billing communication during the relevant period; (iv) **Where**—in electronic and paper claims and supporting documentation submitted to United; and (v) **How**—by submitting claims that sought benefits under United plans without disclosing facts that negated entitlement to payment, thereby creating a misleading impression of claim validity on which United relied.

## SEVENTH COUNTERCLAIM
## NEGLIGENT MISREPRESENTATION

143. ~~110.~~ United incorporates by reference the allegations set forth in the preceding paragraphs of the Counterclaims.

144. ~~111.~~ Counterclaim Defendants negligently submitted or caused to be submitted claims to United seeking reimbursement for testing services allegedly provided to United members reflecting charges that were materially false, as Counterclaim Defendants represented that the claims were properly billed, and that the services were medically necessary and clinically appropriate~~, and that the charges for COVID testing services reflected Genesis's posted cash price~~.

145. ~~112.~~ Counterclaim Defendants submitted or caused to be submitted the information in each claim in the ordinary course of their business. United relied on that information to determine reimbursement amounts paid to Genesis.

146. ~~113.~~ Genesis's claims submissions included misrepresentations and false information as set forth in the preceding paragraphs.

147. ~~114.~~ United reasonably relied on Counterclaim Defendants' material false statements and omissions and paid certain of the false and misleading claims that Genesis submitted.

148. ~~115.~~ In reliance on Counterclaim Defendants' negligent misrepresentations, United was damaged in an amount to be determined at trial.

149. United pleads this claim with particularity. (i) **Who**—Genesis and Metropolitan, acting jointly through personnel responsible for claim preparation and submission; (ii) **What**— inaccurate and misleading claim representations regarding the

nature, necessity, and billing propriety of services; (iii) **When**—at the time of each claim submission and related billing communication during the relevant period; (iv) **Where**—in electronic and paper claims and supporting documentation submitted to United; and (v) **How**— by negligently submitting claims that represented entitlement to payment under United plans when Defendants failed to exercise reasonable care to ensure those representations were true.

## EIGHTH COUNTERCLAIM
## UNJUST ENRICHMENT

150. ~~116.~~ United incorporates by reference the allegations set forth in the preceding paragraphs of the Counterclaims.

151. ~~117.~~ Genesis has received and retained a benefit from United in the form of overpayments induced by Counterclaim Defendants' improper, deceptive, and fraudulent billing practices.

152. ~~118.~~ Genesis has unjustly accepted and retained the benefit that United conferred on it.

153. ~~119.~~ It would be unjust and inequitable for Genesis to continue to retain the benefit that United conferred on it.

154. The benefit Genesis received was conferred through fraudulent claim submissions. Genesis obtained payment only by submitting claims through Metropolitan that represented entitlement to benefits under United plans and by misrepresenting that the services billed were properly ordered, necessary, and reimbursable. The unjust enrichment arose directly from Genesis's fraudulent invocation of plan benefits.

## NINTH COUNTERCLAIM
## CIVIL CONSPIRACY

155. ~~120.~~ United incorporates by reference the allegations set forth in the preceding paragraphs of the Counterclaims.

156. ~~121.~~ As described in detail herein, Genesis and Metropolitan ~~acted in concert and with a common purpose~~, by virtue of their common ownership by Rajiv Uppal, M.D. and their coordinated operations, agreed and conspired to defraud United through the submission of false and misleading claims.

157. ~~122.~~ As described in detail herein, Genesis and Metropolitan have each committed overt acts in furtherance of the conspiracy~~.~~, including: (a) preparing and submitting duplicative billing claims for COVID-19 tests already billed by AEC and other providers; (b) preparing and submitting claims for unauthorized ancillary tests that were never ordered, as confirmed by member interviews; (c) selecting billing codes, including HCPCS code U0004, that misrepresented the testing technology used; (d) selecting POS codes that misrepresented the location of specimen collection; (e) violating the NCCI guidelines and United's Laboratory Services Reimbursement Policy; and (f) concealing material information from United regarding the true nature and pricing of the services billed.

158. ~~123.~~ United has been injured as a result.

**TENTH COUNTERCLAIM**
**DECLARATORY JUDGMENT**

159. ~~124.~~ United incorporates by reference the allegations set forth in the preceding paragraphs of the Counterclaims.

160. ~~125.~~ Genesis submitted claims to United for materially false charges, as Genesis represented that the claims submitted reflected its actual posted cash price (*i.e.*, the price it charged cash-paying customers), that the claims were properly billed, and that the services were

medically necessary and clinically appropriate.— when Genesis actually submitted claims that misstated its posted cash price and that were improperly billed, including claims reflecting duplicative billing and claims for ancillary testing that was not ordered and/or was improperly unbundled.

161. 126. Pursuant to 28 U.S.C. § 2201(a), United seeks a declaratory judgment establishing that Genesis is precluded from seeking reimbursement at fully billed charges for overpriced claims, for claims improperly billed, for services not rendered, and for services not medically necessary or appropriate.

**PRAYER FOR RELIEF**

Based on the foregoing, United requests that the Court enter judgment in its favor, dismissing the Second Amended Complaint in its entirety, with prejudice, and awarding United the following relief:

- recoupment of all monies paid to Genesis for false or up-charged claims for testing services submitted to United;
- no less than $30 million in monetary damages for harm suffered as a result of Counterclaim Defendants' conduct;
- declaratory relief;
- exemplary and punitive damages;
- pre-judgment and post-judgment interest;
- attorneys' fees and costs;
- court costs; and
- such other and further relieverelief to which United may be entitled in law or equity.

**JURY DEMAND**

United demands a trial by jury on all issues so triable.

[*Signature Block on Next Page*]

Dated: ~~February 26~~April 27, ~~2025~~2026

*/s/ ~~Jenny Kramer~~Christopher J. Borchert*

Jenny Kramer
Christopher J. Borchert
**ALSTON & BIRD LLP**
90 Park Avenue
New York, New York 10016
Tel. (212) 210-9400
Fax (212) 210-9444
Jenny.Kramer@alston.com
Christopher.Borchert@alston.com

William H. Jordan (admitted *pro hac vice*)
Jason Popp (admitted *pro hac vice*)
Jordan Elise Edwards (admitted *pro hac vice*)
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Tel. (404) 881-7000
Fax (404) 881-7777
Bill.Jordan@alston.com
Jason.Popp@alston.com
Jordan.Edwards@alston.com

*Attorneys for Defendants/~~Counterclaim- Plaintiffs~~Counterclaim Plaintiffs*

**CERTIFICATION PURSUANT TO LOCAL RULE 11.2**

Pursuant to Local Rule 11.2, undersigned counsel for United hereby certifies, to the best of ~~her~~his knowledge, that this matter in controversy is not the subject of any other action currently pending in any court.

I declare under penalty of perjury that the foregoing statements made by me are true.

*/s/ ~~Jenny Kramer~~Christopher J. Borchert*

~~Jenny Kramer~~

Christopher J. Borchert

**CERTIFICATE OF SERVICE**

I ~~hereby~~ certify that on ~~February 26~~April 27, ~~2025~~2026, I caused a true and correct copy of the foregoing DEFENDANTS~~' ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND THIRD-PARTY~~/COUNTERCLAIM PLAINTIFFS' FIRST AMENDED COUNTERCLAIM AND THIRD PARTY COMPLAINT to be served on all counsel of record via the Court's CM/ECF system.

Dated: ~~February 26~~April 27, ~~2025~~2026

/s/ ~~*Jenny Kramer*~~*Christopher J. Borchert*

~~Jenny Kramer~~

Christopher J. Borchert

| **Summary report:<br>Litera Compare for Word 11.11.0.158 Document comparison done on 4/27/2026 1:25:04 PM** | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Genesis_ DRAFT Answer_ Aff. Defenses_ and Counterclaims(45575332.9).docx | |
| **Modified DMS:** iw://alston.cloudimanage.com/legal/51138630/7 - Genesis -First Amended Counterclaim.docx | |
| **Changes:** | |
| Add | 312 |
| ~~Delete~~ | 484 |
| ~~Move From~~ | 0 |
| Move To | 0 |
| Table Insert | 0 |
| ~~Table Delete~~ | 0 |
| Table moves to | 0 |
| ~~Table moves from~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 796 |